# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00051-CV

**Robert Mayfield, Laura North, Stuart Dupuy, and Bob Woody, Appellants**

**v.**

**City of Austin, Texas, and T.C. Broadnax in his Official Capacity as City Manager, Appellees**

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-007085, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants Robert Mayfield, Laura North, Stuart Dupuy, and Bob Woody sought a writ of mandamus from the trial court ordering the City of Austin and T.C. Broadnax[1] in his Official Capacity as City Manager (collectively, the City) to enforce a city ordinance regulating public camping. The trial court dismissed the petition with prejudice, concluding that Appellants lacked standing and that there was no justiciable controversy with proper parties before the trial court. While we agree that the Appellants failed to demonstrate standing and thus the trial court's jurisdiction, we will reverse the order granting the plea to the jurisdiction and remand the cause for further proceedings to allow Appellants the opportunity to replead.

---

[1] Spencer Cronk was the city manager when the suit was in the trial court. We take judicial notice that T.C. Broadnax has since become the city manager of Austin and substitute him in Cronk's place in this lawsuit in his official capacity. *See* Tex. R. App. P. 7.2(a) (allowing substitution when public officers who are parties to suits in their official capacity are replaced in office during pendency of appeal).

# BACKGROUND

In June 2019, the Austin City Council amended provisions in Austin City Code Section 9-4-11 concerning camping and solicitation in public areas of Austin and sitting or lying down on public sidewalks or sleeping outdoors in parts of downtown. The amendment limited circumstances in which a person camping in public committed an offense to situations in which,

> after having been notified by a law enforcement officer that the conduct violates [the camping ban] and having been given a reasonable opportunity by a law enforcement officer to correct the violating conduct, the person camps in a public area not designated as a camping area by the City of Austin and the person is (1) materially endangering the health or safety of another person or of themselves; or (2) intentionally, knowingly, or recklessly rendering impassable or impeding the reasonable use of a public area making usage of such area unreasonably inconvenient or hazardous.[2]

Austin residents Matt Mackowiak and Cleo Petricek filed a petition in November 2020 to "reinstate the Public Camping Ban," seeking to place before Austin voters a ballot item to amend the City Code essentially to return to pre-June 2019 standards. Mackowiak and Petricek initially challenged the City Clerk's decision not to certify the petition for the ballot initiative. After the clerk received a new petition, the ballot initiative to amend Section 9-4-11 was placed on the ballot as Proposition B. In May 2021, voters approved Proposition B by 58% to 42%.

Mackowiak and Petricek amended their pleadings in August 2021, replacing their challenge to the rejection of the petition with a request for a writ of mandamus requiring the City and the city manager to enforce the amended version of Section 9-4-11 that criminalizes certain camping outside of designated areas. The same day, Appellants intervened in this lawsuit seeking the same mandamus relief as the original plaintiffs.

---

[2] The underlined portion is text amended by the 2019 amendment.

Appellants are business owners who allege that the City is refusing to enforce Proposition B and that, as a result, unnamed individuals are committing various criminal acts on and near their business property. They alleged as follows:

> 12.    Although Section 9-4-11 has been reinstated to prohibit camping and although the City Manager has been charged with administration and enforcement of the ban, the City and City Manager [have] refused to enforce the camping ban. That refusal leaves voters and residents of the City in the same position as they were before the ban was reinstated.

> l3. Defendants' inexplicable refusal to enforce the Section 9-4-11 has resulted in severe business disruption. Intervenors have incurred substantial expenses to protect their property, their customers, and their clients.

Appellants filed declarations attached to their petition describing conditions before and after the 2019 amendment to camping restrictions and detailing some of the harms they claim from the City's alleged inaction:

- Dupuy said that before 2019 he had no break-ins and no harassment of clients and that he employed a homeless man to help out in the building. He asserted that the amendments led to large encampments near his office and that security cameras showed increased activity at night. People broke into the building three times, stole a catalytic converter from a van, bathed using their exterior faucet, moved into their playscape, and defecated in their planter ten feet from where Dupuy was interviewing a job candidate. Dupuy said he had seen needles, bottles of urine, and garbage in their parking lot. Dupuy said he hoped that Proposition B would help conditions.

- Mayfield declared that he had many problems with the homeless population at two of his Dairy Queens in particular. He said that homeless individuals used the bathrooms without buying products and bothered customers by asking for money both in the store and in the drive-thru line. He hired a security company but found that they were not respected. He hired off-duty police officers who were costlier but more effective at dissuading homeless individuals from bothering paying customers. He said that the off-duty officers cost $72,000 per year per store. He asserted that nothing had changed in the three months after Proposition B passed in May 2021.

- Woody declared that after 2019 encampments had multiplied and the behavior of homeless individuals had become increasingly aggressive. He said that one of his

3

businesses had called police nearly every day for three years and had been burglarized ten times. He asserted that drug deals went unnoticed or overlooked, that women were being victimized, and that individuals were allowed to sleep anywhere at any hour of the day. He said that the voters had spoken and that the City should not ignore their choice.

- North declared that her neighborhood changed with the 2019 amendments. The number of people experiencing homelessness at a bridge near her salon increased overnight and led to increased trespassing. Her windows and front door were shattered, her salon had been broken into three times causing the loss of $5000 worth of merchandise and equipment, and her electrical box had been ripped off. She said that people trespass during and after business hours, turning angry when asked to leave. She said she, stylists, and clients had witnessed public masturbation, drug use, defecation, and fights. She said that one man tried to force himself on a stylist when she asked him to leave, another spit beer in a stylist's face, and another waved his genitals at a stylist as she was walking to her car. She described other acts of violence in her neighborhood and said that her husband found a homeless woman naked in their backyard pool. She said she hoped that the court would allow regulations to take effect and return safety and security to her community.

The City filed a plea to the jurisdiction contending that Appellants and the original plaintiffs lacked standing to seek mandamus in the trial court. The City's plea's lone exhibit was a copy of Section 9-4-11. The trial court did not take testimony at its hearing on the plea but received additional declarations from Dupuy, Mayfield, and Woody:

- Dupuy declared additionally that

[s]ince Prop B went into effect, we have had the following problems:

   a. Homeless people using drugs on our property. The drugs are often heroin.
   b. A homeless man from a nearby illegal camp came to the door of my business brandishing a large knife. One of my employees, who is also a mother, had to lock herself in one of the bathrooms out of fear of being murdered.
   c. Homeless people frequently come to camp on my business property. They typically are coming from one of the multiple illegal camps very near my business.

[] These problems are essentially the same ones we had before the camping ban was repealed and before Prop B went into effect. If the City were enforcing Prop B, these problems should begin to decline, but they haven't. The only reasonable explanation is that the City has chosen to act as if Prop B never passed.

4

- Mayfield reiterated the frustration of his hopes that the passage of Proposition B would alleviate his problems with homeless persons by causing the city to clean up and move away "these people." He reported that, despite the passage of Proposition B, he continued to employ off-duty police officers. He stated that, after Proposition B went into effect, "a homeless person from a nearby illegal campsite came into one of our stores, removed his clothes, and walked around harassing customers." The passage of Proposition B had not stopped homeless people from sleeping in the doorways of his restaurants and ignoring the orders of female employees to leave, sometimes threatening to harm the employees. He asserted that the City's failure to enforce Proposition B cost his business money and increased prices for his customers.

- Woody declared additionally that:

  [a]s of today and for the past several months, on a daily basis my businesses experience one or more of the following problems:
    a. Homeless people sleeping in the doorways to my businesses
    b. Drug dealing by homeless people at or near my businesses
    c. Assaults of my employees or customers by homeless people
    d. Panhandling at or near my businesses

  [] Every morning, my employees who open my businesses have to clean out the areas outside my businesses with bleach to disinfect human waste left there by homeless people. Nearly every morning, the employee who opens has to tell a sleeping homeless person to leave. Due to the threats frequently made by the people sleeping in the doorways of my businesses, I cannot allow female employees to open in the morning because it is unsafe for them.

  Because of the City's refusal to enforce Prop B, I regularly have to employ[] off-duty officers to protect my employees, my customers, and my businesses. This is a significant cost to my businesses.

  Before the camping ban was repealed, none of these problems were nearly as severe as they are now. Occasionally, homeless people would come around and cause minor problems. Now that they are permitted to have camps nearby, the problem is constant. Once Prop B went into effect, these problems should have returned to the way they were before the camping ban was repealed, but they have not. They have not gotten noticeably better since Prop B went into effect, and that is because the City of Austin refuses to enforce Prop B and continues to act as if the law does not exist.

Mackowiak and Petricek nonsuited their claims, and the trial court dismissed Appellants' claims, concluding that Appellants "do not have standing to assert the claims alleged in this lawsuit and

there is no current justiciable controversy with proper parties." The court declined to issue findings of fact and conclusions of law.

## APPLICABLE LAW

Standing is a party's justiciable interest in a controversy and is a component of subject-matter jurisdiction. *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 661-62 (Tex. 1996); *Zuffa, LLC v. HDNet MMA 2008 LLC*, 262 S.W.3d 446, 451 (Tex. App.—Dallas 2008, no pet.). To establish standing, plaintiffs must show (1) that they have an injury in fact that is both concrete and particularized and actual or imminent; (2) that the injury is fairly traceable to the defendant's challenged actions; and (3) that the injury is likely as opposed to merely speculative and that the injury will be redressed by a favorable decision. *Heckman v. Williamson County*, 369 S.W.3d 137, 154 (Tex. 2012); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Generally, parties lack standing to sue challenging the lawfulness of governmental actions. *Bacon v. Texas Hist. Comm'n*, 411 S.W.3d 161, 174 (Tex. App.—Austin 2013, no pet.). Further, standing is more difficult to establish when a causal relation between injury and challenged action depends upon the decision of an independent third party. *California v. Texas*, 593 U.S. 659, 675 (2021); *Green v. Texas Comptroller of Pub. Accts.*, 697 S.W.3d 305, 311 (Tex. App.—El Paso 2023, pet. pending); *see also Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 485 (Tex. 2018) (holding that Texas courts may look to federal standing requirements for guidance). When an alleged injury arises from the government's regulation or lack of regulation of someone else, "causation and redressability ordinarily hinge on the response of the third party to the government action or inaction—and perhaps on the response of others as

well." *Lujan*, 504 U.S. at 562; *see also Meyers*, 548 S.W.3d at 486. The plaintiff has the burden to adduce facts showing that the third parties have made or will make choices that could show causation and permit redressability of injury. *Lujan*, 504 U.S. at 562; *Meyers*, 548 S.W.3d at 486. The plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 561; *Abbott v. G.G. E.*, 463 S.W.3d 633, 646 (Tex. App.—Austin 2015, no pet.).

We review de novo a trial court's order granting or denying a plea to the jurisdiction based on standing. *Farmers Tex. Cnty. Mut. Ins. v. Beasley*, 598 S.W.3d 237, 240 (Tex. 2020). Courts must construe the pleadings in the plaintiff's favor and consider relevant evidence offered by the parties. *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018). Plaintiffs are not required to put on their case simply to establish jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). We look to the pleader's intent and accept as true the factual allegations in the pleadings. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). If the pleadings or record conclusively negate the existence of jurisdiction, the suit should be dismissed. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 96 (Tex. 2012). But if the pleadings and record do not conclusively negate jurisdiction, the defendant entity has the burden to show either that the plaintiff failed to show jurisdiction despite having had full and fair opportunity in the trial court to develop the record and amend the pleadings; or, if such opportunity was not given, that the plaintiff would be unable to show the existence of jurisdiction if the cause were remanded to the trial court and such opportunity afforded. *Id.*

Because the trial court did not specify on which ground of standing Appellants' pleadings failed, we must affirm if any ground of the plea is meritorious. *Garza v. Garcia*, 137 S.W.3d 36, 37 (Tex. 2004).

**DISCUSSION**

Appellants contend that the trial court erred in granting the City's plea to the jurisdiction because Appellants alleged sufficient facts demonstrating the court's jurisdiction. Though the City does not contest that Appellants have an injury in fact that is both concrete and particularized and actual or imminent, we will briefly review the pleadings and evidence because the injuries claimed underlie the challenges to Appellants' standing.

Appellants alleged that the City has refused to enforce Proposition B[3] and that such refusal has resulted in severe business disruption. Appellants' declarations discussed above described disturbing and dangerous interactions that they, their employees, and clients had with individuals who Appellants indicated were homeless persons allowed to camp near Appellants' businesses through the City's failure to enforce Proposition B. Appellants asserted that they have suffered injuries and theft losses and incurred substantial expenses to protect their property, their customers, and their employees. They also describe emotional stress to their customers, employees, and families.

The City argues that Appellants' request for a writ of mandamus ordering the City and City Manager to enforce Proposition B is not redressable because it is not cognizable under the United States Supreme Court's recent opinion on standing in *United States v. Texas*, 599 U.S. 670, 676 (2023) (stating that cognizability requires redressability). The City also characterizes Appellants' contention that enforcement of Proposition B would redress Appellants' complaints as conclusory and speculative, in part because they seek to control the behavior of persons not before the court.

---

[3] We will discuss allegations and arguments about enforcement of Austin City Ordinance Section 9-4-11 as amended in 2021 as enforcement of Proposition B to avoid confusion over what version of Section 9-4-11 is being discussed.

8

In *Texas*, the Supreme Court described the limits of states' standing to request a court order that the Department of Homeland Security implement a statutory directive that DHS "shall" arrest certain violators of immigration law. *See id.* at 674, 684. The Court reiterated its previous holding that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* at 674 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). It opined that the states cited no "precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions." *Id.* at 677. The Supreme Court wrote that "courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions." *Id.* at 676, 680. It further opined that arrests and prosecutions are discretionary decisions for the executive, "not the Judiciary," noting that "courts generally lack meaningful standards for assessing the propriety of enforcement choices in this area." *Id.* at 678-79. The Court wrote that "the Executive Branch must prioritize its enforcement efforts" while constrained by both a lack of "resources to arrest and prosecute every violator of every law and . . . the ever-shifting public-safety and public-welfare needs of the American people," with the result that "the Executive Branch must balance many factors when devising arrest and prosecution policies." *Id.* at 679-80.

Appellants argue that *Texas*'s standing analysis does not apply here because they do not seek an order of more arrests and prosecutions, merely an end to the City's refusal to enforce the ordinance; they note that Section 9-4-11 "calls for offenders to be instructed that they are camping in an unauthorized location, be advised of what locations are authorized and only calls for citation under narrowly prescribed circumstances." Appellants also rely on the Court's

9

conditional caveats that "the standing calculus *might* change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions" and that "an extreme case of non-enforcement arguably *could* exceed the bounds of enforcement discretion and support Article III standing." *See id.* at 682 (emphases added) (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)).

Appellants have not pleaded law and facts that exclude their claims from the reach of the *Texas* analysis. The *Texas* opinion reaches Appellants' claim even though they disclaim seeking more arrests and prosecutions. The Supreme Court in *Texas* discussed statutory enforcement in terms of increased arrests and prosecutions because that is what the states sought through enforcement of the statute. *See id*. at 676 (citing 8 U.S.C. § 1226(c)). The Supreme Court held in *Texas* that states lack a judicially cognizable interest in the prosecution of another. *Id.* at 677. Here, Appellants seek enforcement of Proposition B that can lead to issuance of citations to third parties. We find no basis to restrict the reach of *Texas* based on the severity of punishment. Appellants have not pleaded law or facts to overcome the long-held principle that litigants lack standing to contest the policies of an arresting or prosecuting authority when the litigants are not being arrested or prosecuted or threatened with arrest or prosecution. *See id.*

Appellants' allegations of non-enforcement of Proposition B do not reach the level contemplated in the *Texas* opinion that would confer standing on them. The Court opined that this exception could apply to an agency that "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *See id.* at 682-83; *see also Neurological Surgery Prac. of Long Island, PLLC v. United States Dep't of Health & Hum. Servs.*, 682 F. Supp. 3d 249, 258 (E.D.N.Y. 2023) (rejecting plaintiff's standing argument that some of its claims fell within *Texas–Heckler* abdication exception partly

because "[p]laintiff must point to an *express* policy of nonenforcement, and it has not done so"). Appellants' allegations that the City and City Manager, "in response to the ordinance passing, are refusing to fully enforce the ordinance" and that they have "refused to enforce the camping ban" in the ordinance fall short of the conscious and express adoption of a policy that amounts to an abdication of their responsibilities. The affidavit testimony is speculative and conclusory regarding any conscious and express decision-making by the City—e.g., Dupuy's assertion that "the only reasonable explanation" for the continuing crime is that "the City has chosen to act as if Prop B never passed" and Woody's assertion that conditions have not improved "because the City of Austin refuses to enforce Prop B and continues to act as if the law does not exist." *See City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010) (per curiam) (conclusory, bare allegations insufficient to support jurisdiction); *see also City of Valley Mills v. Chrisman*, No. 10-18-00265-CV, 2021 WL 1807365, at *3 (Tex. App.—Waco May 5, 2021, no pet.) (mem. op.) (reversing denial of plea to the jurisdiction partly because plaintiffs' pleaded allegations and affidavits were insufficient based on rule that "[v]ague and conclusory statements within a pleading are insufficient to support jurisdiction; otherwise, the jurisdictional inquiry would become meaningless"). Appellants have not pleaded facts and law making their claims cognizable or redressable under the *Texas* exception for conscious and express adoption of a general policy of non-enforcement.

Appellants' pleadings and evidence also do not show that their injuries are redressable by the court order requested. When standing depends on unfettered choices made by independent actors who are not before the court and whose actions the court cannot presume to control or predict, the plaintiff must adduce facts showing that those independent actors' choices will be made in ways that permit redressability. *Lujan*, 504 U.S. at 561-62. Appellants plead

11

and assert in their affidavits actions by third parties that violate community sensibilities as well as criminal statutes. They seek a mandamus that the City and City Manager "enforce" Proposition B, without any more precision, but the pleadings and proof do not show that such an order could be sufficiently clear or effective to redress their injuries. *See Arizona v. Garland*, 730 F. Supp. 3d 258, 282, 283 (W.D. La. 2024) (States seeking to require federal government to enforce statutory mandate to "maintain operational control" over United States' borders lacked standing under *Texas* because court could not "redress the issue of operational control at the border"). The nature of Proposition B makes redress through court order challenging to show. Before anyone may be cited for violating Proposition B, the ordinance requires officers to

> make a reasonable effort to: (1) advise the person of a lawful alternative place to camp[4]; (2) advise the person, to the best of the law enforcement officer's knowledge, of available shelter or housing; and (3) contact, if reasonable and appropriate, a city designee who has the authority to offer to transport the person or provide the person with services.

Austin, Tex., Code § 9-4-11(C) (2024). The ordinance provides for an affirmative defense "for sitting or lying if a person is sitting or lying and is obstructing the right-of-way, but is seated or lying down as the result of a physical manifestation of a disability, not limited to visual observation." *Id.* § 9-4-11(H) (2024). This ordinance is more nuanced, layered, and discretionary than the statute in *Texas* that was described as a "statutory arrest mandate" for "any alien" who was deemed inadmissible or deportable for defined reasons including having

---

[4] "Camp" is defined as meaning "the use of a public area for living accommodation purposes including: (a) storing personal belongings for an extended period of time; (b) making a camp fire; (c) using a tent or shelter or other structure for a living accommodation; (d) carrying on cooking activities; or (e) digging or earth breaking activities." Austin, Tex., Code § 9-4-11(A)(2) (2024).

12

committed listed offenses.  *See* 599 U.S. at 682.  That facially clearer "arrest mandate" fell short of showing a legislative authorization to sue to compel enforcement:

> Given the "deep-rooted nature of law-enforcement discretion," a purported statutory arrest mandate, without more, does not entitle any particular plaintiff to enforce that mandate in federal court.  For an arrest mandate to be enforceable in federal court, we would need at least a "stronger indication" from Congress that judicial review of enforcement discretion is appropriate—for example, specific authorization for particular plaintiffs to sue and for federal courts to order more arrests or prosecutions by the Executive.

*Id.* (internal citations omitted) (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005)).  Appellants point to no such stronger legislative indication here.

Complicating redressability further is that compelling enforcement of an ordinance like Proposition B implicates other factors like police staffing and funding, which in turn influence allocation of police resources and the ability to enforce the law.  In his initial declaration, Mayfield swore that "[t]he police also tell us that they no longer have the resources to properly police this problem."  As discussed above, the United States Supreme Court in *Texas* discussed the impact of limited resources on governmental action.  *See id.* at 679-80.  Similarly, when denying a petition for writ of mandamus, the Texas Supreme Court discussed the effect of limited resources on the ability of a governmental agency to comply with a statute.  *In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 293-97 (Tex. 2022) (discussing legislative choices, executive discretion, and separation of powers).[5]  Though *Stetson* focused on whether the agency was engaged in a discretionary function, *see id.*, it informs our consideration of whether Appellants have alleged a redressable injury.  The only evidence in the record is that the City's police do not have the necessary resources to enforce Proposition B.  In such circumstances, the

---

[5] There is no mention of a jurisdictional challenge.  *See generally In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292 (Tex. 2022) (orig. proceeding).

requested order to enforce Proposition B would have no effect and could not redress Appellants' injuries.

We conclude that Appellants lack standing to sue the City and the City Manager to compel enforcement of Proposition B. Their claim as pleaded is not redressable.

We conclude, however, that the trial court erred by dismissing this cause with prejudice. Remand is proper when pleadings do not affirmatively negate the existence of jurisdiction by revealing an incurable defect. *See Texas A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007); *Miranda*, 133 S.W.3d at 227. Parties are entitled to a full and fair opportunity in the trial court to develop the record and amend their pleadings, and dismissal is improper without a demonstration that, even with a remand, the claimant would be unable to show the existence of jurisdiction. *See Pena v. City of Garland*, No. 05-21-00611-CV, 2021 WL 6143710, at *6 (Tex. App.—Dallas Dec. 30, 2021, no pet.) (mem. op.). Because the law and record do not establish that Appellants are incapable of pleading facts that demonstrate standing, we conclude that the trial court should have given Appellants the opportunity to amend their pleadings.[6]

---

[6] Because we do not know what Appellants will plead on remand, we will not speculate regarding whether their repleading will fall within the bounds of challenges to criminal laws that are cognizable in civil courts. *See* Tex. R. App. P. 47.1; *see also Passel v. Fort Worth Indep. Sch. Dist.*, 440 S.W.2d 61, 63-64 (Tex. 1969) (though equity courts normally do not interfere with enforcement of criminal statute absent unconstitutionality and irreparable injury to vested property rights, jurisdiction existed when students had no way to challenge rule except by civil action). *But see Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (challenge to prosecutorial inaction not cognizable in civil court because mother had not alleged sufficient nexus between requested imprisonment of father and alleviation of damages of unpaid child support).

## CONCLUSION

While we agree that the Appellants' pleadings did not establish their standing and the trial court's jurisdiction, we reverse the order dismissing the cause with prejudice and remand the cause for further proceedings to allow Appellants the opportunity to replead.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Reversed and Remanded

Filed:   January 31, 2025

15